2017 FEB 27 AM 10:33
COURT OF APPEALS DIV I

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 72467-3-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| D'ANGELO A. SALOY, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | FILED: February 27, 2017 |

MANN, J. — In October 2008, 16-year-old D'Angelo Saloy was involved in a drive-by shooting near Seattle's Garfield High School that killed one youth and injured another. In 2012, after a lengthy investigation, the State charged Saloy with the shootings. A jury convicted Saloy of first degree murder with a firearm enhancement for the death of Quincy Coleman. The jury also convicted Saloy of first degree attempted murder with a firearm enhancement for shooting Demario Clark. The trial court imposed a standard range sentence of 712 months imprisonment. Saloy will be over 80 years old before eligible for release.

Saloy raises multiple issues on appeal including: (1) the validity of the intercept order, (2) prosecutorial misconduct for comments made at trial, (3) the admission of gang related evidence, (4) preaccusatorial delay resulting in prejudice, and (5) the

imposition of mandatory legal financial obligations. We affirm the trial court on these five issues and affirm Saloy's conviction.

Saloy also challenges the trial court's imposition of a de facto life-without-parole sentence without conducting a Miller[1] hearing to consider mitigating circumstances related to Saloy's age at the time of the crime. As our Supreme Court recently confirmed: "When a juvenile offender is sentenced in adult court, youth matters on a constitutional level. Even for homicide offenses, 'mandatory life-without-parole sentences for juveniles violate the Eight Amendment.'" State v. Ramos, No. 92454-6, slip op. at 1 (Wash. Jan. 12, 2017) (quoting Miller v. Alabama, 567 U.S. ___, 132 S. Ct. 2455, 2464, 183 L. Ed. 2d 407 (2012)). Because the trial court imposed a de facto life-without-parole sentence, the sentencing court must conduct an individualized Miller hearing and "'take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.'" Ramos, slip op. at 1 (quoting Miller, 132 S. Ct. at 2469).

We vacate Saloy's sentence and remand for resentencing.

## FACTS

On the evening of October 31, 2008, five teenagers affiliated with the Central District (CD) gang: Quincy Coleman, Gary Thomas, Demario Clark, Frank Graves, and Cleden Jimerson, were standing on the stairs leading to the Garfield High School baseball fields. A car pulled up and shooting began. Two bullets struck Coleman, killing him. Clark suffered two gunshot wounds but survived.

---

[1] Miller v. Alabama, 567 U.S. ___, 132 S. Ct. 2455, 2464, 183 L. Ed. 2d 407 (2012).

The police found a single .40 caliber shell casing at the scene. Both bullets recovered from Coleman's body were .38 caliber. Clark's wounds were "through and through," so the police were unable to identify the type of gun used to shoot him. The case was assigned to Detective Dana Duffy and her partner. Although there were numerous bystanders, no witnesses were able or willing to identify the shooters.

Clark was uncooperative and hostile with the police when they spoke with him at the hospital; he refused to provide a statement, or participate at trial. Jimerson told the police only that the car was a light-colored Ford Taurus. Graves agreed to an interview with the police a week after the shooting. However, the only information he provided was that he believed the car involved was a silver Ford Taurus and that he saw a dark-skinned arm with a gun.

Detective Duffy initially focused on a South End gang member named Monroe Ezell and a Samoan male named "Ramsey." Duffy interviewed Ezell in November 2008. Ezell claimed that around the time of the crime, he was at the Union Gospel Mission to pick up community service paperwork. Ezell gave conflicting accounts of where he went afterwards. Robert Martin, who worked at the Union Gospel Mission, later confirmed that Ezell had been at the Mission around the time of the shooting. Martin also informed Duffy that Ezell told him that "a guy named D'Angelo Saloy" and "Ramsey" had done the shooting. Duffy was able to identify "Ramsey" as Ramsey Fola. Detectives learned that one of Fola's family members owned a gray Ford Taurus that Fola sometimes drove.

When the detectives interviewed Fola, he told the police that he was at his friend Kenneth Woods' house on the night of the shootings. In December 2008, Woods and

his mother told detectives that Fola and Saloy were at their home the night of the shooting. Woods did not remember what time they came over. Because Fola had turned off his cell phone during the time of the shooting, police were unable to confirm his location at that time.

Duffy interviewed Dewaun Miller on March 9, 2009. Miller stated that Saloy had told him that he shot Coleman and that Fola was driving. On March 10, 2009, the police went to a possible address for Saloy and left a message for him to contact them. Saloy called Duffy the next day and said that he would arrange a meeting the following week; however, Saloy did not call back or answer his phone.

On June 30, 2009, Gang Unit detectives alerted Duffy that they were holding Saloy at police headquarters for an unrelated incident. Duffy interviewed Saloy about Coleman's murder for the first time. Saloy told her that he was at Woods' house with Fola and estimated that he left before it got "real dark." Saloy did not recall how he got to or left Wood's house. He believed that he walked or that his sister picked him up.

On September 29, 2009, police arrested Wendell Downs on an unrelated matter. Downs informed police that he heard Saloy bragging about shooting Coleman. Downs told police that Saloy said he had a .38 caliber revolver and Ramsey had a .40 caliber semiautomatic handgun. Downs also claimed that he heard Fola talking about how he was driving his brother's Ford Taurus while Saloy shot at Coleman and his friends.

In December 2009, Downs contacted Duffy and arranged to meet at Mount Baker Park on the shore of Lake Washington. Once at the lake, Downs pointed out the location where Saloy told Downs he had thrown the guns. Downs reported that two days earlier, Saloy brought Downs with him to retrieve the guns but the water was too

cold. Duffy called the Harbor Patrol to look for the weapons but due to the hours of daylight and dense foliage, they were unable to locate them.

Based on her investigation and communications with Downs, on January 4, 2010, Duffy applied for and received an order authorizing Duffy and the Seattle Police Department to intercept and record conversations of Saloy and Fola with Downs. Downs was unable to make contact with either Fola or Saloy prior to the expiration of the order.

In August 2010, Duffy made contact with a confidential witness who informed her that on the night of the murder he was in his car when a vehicle occupied with a Samoan male and Saloy pulled up. He reported that Saloy said he had just shot two CD guys on the stairs at the Garfield Community Center. Saloy reportedly pulled out a .38 revolver out and showed it to the witness. The witness reported that Saloy said it was a "CD-Southend" thing, a retaliation shooting for the shooting of a South End member.

On October 10, 2010, Duffy learned that Homeland Security believed Juan Sanchez had information about the Coleman murder. Under threat of deportation over their immigration status, Sanchez's mother informed Homeland Security that Sanchez told her about the murder and that he knew someone who confessed to being involved. Sanchez agreed to an interview with Duffy and another detective. During the interview, Sanchez informed the detectives that he had known Saloy approximately five years and was a close friend. Sanchez stated that approximately two weeks after the murder, Saloy confessed that he had shot Coleman with a .38 caliber weapon. Sanchez

reported that Saloy told him that Fola was also involved and was driving his sister's car, a Ford Taurus.

Based on her investigation to date, and based on Sanchez's agreement to cooperate, Duffy prepared a second application for an intercept order to record conversations between Sanchez, Saloy, and Fola during the period between November 27, 2010 and December 4, 2010. The intercept order was signed on November 22, 2010.

On December 1, 2010, detectives wired Sanchez and his car for both audio and video. Sanchez picked up Saloy and the two drove around. They drove to Garfield High School, where they got out of the car at the scene of the shooting. During this time, Saloy confessed to murdering Coleman and provided significant detail about the shooting.

In September 2012, the State filed an information charging Saloy with first degree murder and first degree assault. Following Saloy's decision to go to trial, the State amended the first degree assault charge to attempted first degree murder. Both charges included a weapons enhancement and a gang aggravator.

A jury found Saloy guilty of first degree murder with a firearm enhancement for the death of Coleman. The jury also found Saloy guilty of first degree attempted murder with a firearm enhancement for shooting Clark. The jury did not reach a unanimous verdict on the gang aggravators.

On September 10, 2014, the trial court imposed a standard-range sentence of 382 months for the first degree murder, 210 months for the first degree attempted

murder, and 60 months for each of the two weapons enhancements; a total of 712 months imprisonment.

## ANALYSIS

### I

Saloy asserts first that the trial court erred in denying his pretrial motion to suppress the wire recording because the affidavit for the intercept order was legally insufficient. He contends also that the trial court erred in not granting him an evidentiary hearing pursuant to Franks v. Delaware to consider misrepresentations of the evidence within the affidavit. 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). We disagree.

### A

The Washington Privacy Act (WPA), chapter 9.73 RCW, "is considered one of the most restrictive in the nation." State v. Kipp, 179 Wn.2d 718, 724, 317 P.3d 1029 (2014). The WPA prohibits the recording of any "[p]rivate conversation . . . without first obtaining the consent of all persons engaged in the conversation." RCW 9.73.030(1)(b). "Evidence obtained in violation of the act is inadmissible for any purpose at trial." Kipp, 179 Wn.2d at 724; RCW 9.73.050. Recording of conversations with only one party's consent is permitted, however, where law enforcement obtains a judicial order finding probable cause to believe that the nonconsenting party has committed a felony. RCW 9.73.090(2); State v. Manning, 81 Wn. App. 714, 717-18, 915 P.2d 1162 (1996). Such recordings are admissible at trial. RCW 9.73.090(3). In order to obtain advance court approval, the law enforcement officer must submit an

application for an intercept order that satisfies several statutory conditions. RCW 9.73.130.

The parties disagree in their briefing on the appropriate standard of review. The State argues that a judge considering an application for an intercept order has considerable discretion to determine whether the statutory safeguards have been satisfied. State v. Johnson, 125 Wn. App. 443, 455, 105 P.3d 85 (2005); State v. Constance, 154 Wn. App. 861, 880, 226 P.3d 231 (2010). Saloy relies on Kipp for the proposition that because the facts are undisputed our review is de novo. But Kipp held only that the question of whether the conversation was private within the meaning of the WPA could be determined as a matter of law where the facts surrounding the conversation are undisputed. Kipp, 179 Wn.2d at 722-23. We do not need to decide in this case as both the State and Saloy agreed during argument that our review of the intercept order should be de novo. We will uphold the order "'if the facts set forth in the application were minimally adequate to support the determination that was made.'" State v. D.J.W., 76 Wn. App. 135, 145-46, 882 P.2d 1199 (1994) (quoting State v. Knight, 54 Wn. App. 143, 150-51, 772 P.2d 1042 (1989)).

B

At issue is whether the affidavit for the intercept order provided a sufficient "particular statement of facts showing that other normal investigative procedures with respect to the offense have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous to employ." RCW 9.73.130(3)(f). The requirement for a "particular statement of facts" reflects the legislature's desire to allow electronic surveillance under certain circumstances, but not as routine procedure.

Manning, 81 Wn. App. at 720. Before the police can acquire an intercept order, they must have tried or seriously considered other methods and procedures. In addition, they must inform the issuing judge of the reasons why those other methods and procedures have been or likely will be inadequate to resolve the particular case. Manning, 81 Wn. App. at 720. When determining whether to grant an intercept order, "the court must take into account the nature of the crime and the inherent difficulties in proving the crime." Constance, 154 Wn. App. at 883. A statement that merely indicates, "that having a recording to play at trial is advantageous to the State in obtaining a conviction" is not enough to warrant an intercept order. Manning, 81 Wn. App. at 720.

Duffy's affidavit included a detailed analysis of the progress of the detectives in resolving the case between the October 2008 murder and the November 2010 application. Duffy summarized, that given the nature of the crime and parties, it was unlikely any witness would come forward and testify against a gang member. Furthermore, that "[a]bsent an eye witness, the forensic evidence in this case is minimal, thus a confession to the crime would be the only likely piece of evidence that would convict the killer(s) in this case." Duffy explained:

> Due to the Gang mentality and their code of ethics it is proven with the multiple interviews that the victims, witnesses and suspect will not "snitch" on opposing gang members. Additionally, due to the length of time since the crime and the already thorough investigation that has been conducted and not led to charging to date, it is unlikely there will be physical or documentary evidence which, standing alone, will significantly link Saloy and/or Fola to the crimes.

Saloy contends that the justifications did not explain why other methods would be ineffective and instead, simply relied on the assumption that because the crime was

gang related, nobody would be willing to testify. Saloy compares this language to the type of "boilerplate" justifications discussed in Manning, 81 Wn. App. at 720. In Manning, the court rejected "boilerplate" justifications, such as "an [i]nterception and recording would avoid a one-on-one swearing contest as to who said what, provide uncontroverted evidence of Manning's criminal intent, minimize factual confusion, and rebut anticipated allegations of entrapment." Manning, 81 Wn. App. at 720. The court found that this language had become common in application under the Privacy Act, and that such "boilerplate language" clearly contradicts the statute's particularity requirement. Manning, 81 Wn. App. at 720. However, the Manning court determined that the application was still "adequate because it contains more than boilerplate recitals." Manning, 81 Wn. App. at 721.

Like Manning, the application here is also adequate. While the affidavit does include some boilerplate language and assumptions based on the character of the crime, Duffy's affidavit fully describes the difficulties the detectives had in obtaining reliable evidence. The affidavit explained that the case had remained open for over two years and described the limited witness testimony; including that the only witnesses present during the shooting made it clear they would not cooperate. The affidavit explained that the detectives had no physical evidence linking anyone to the shooting; other than a few bullets at the scene, the guns used were never recovered. The affidavit also explained that the only evidence available were statements from informants who were not present at the scene and could only testify to having heard Saloy discuss the crime. Several of these informants asked to remain anonymous; others were Saloy's friends and fellow gang members.

-10-

Saloy argues that the recording was not necessary because Downs and Sanchez were willing to work with the police. However, Downs did not witness the shooting and could only state that Saloy admitted to committing the shooting. While Downs informed the police that Saloy brought him to Lake Washington to retrieve the guns used in the shooting, they were unable to do so. Downs could not corroborate that the guns had been there or that Saloy actually knew where the guns were. Sanchez also did not witness the shooting. And arguably, Sanchez was only cooperating because of the threat that his family would be deported if he did not cooperate—an incentive to potentially exaggerate his knowledge about the crime.

In State v. Platz, the court upheld an application that included statements indicating the homicide had gone unsolved for over nine months and although other techniques found some evidence, the application indicated that absent a recording, the case would be reduced to a one-on-one swearing contest. 33 Wn. App. 345, 350, 655 P.2d 710 (1982). While this must be a secondary consideration, it is a consideration. Manning, 81 Wn. App. at 721; Platz, 33 Wn. App. at 350.

We hold the facts in the affidavit were sufficient to demonstrate a "particularized statement of facts" that was "minimally adequate to support the determination" that other methods were inadequate in this particular case.

C

Saloy argues next that Duffy's affidavit included false statements and omitted material facts. Consequently, Saloy contends, the trial court should have granted his

request for a Franks Hearing.[2] Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). We disagree.

In Franks, the Supreme Court held that the Fourth Amendment requires a hearing be held at the defendant's request where the "defendant makes a substantial preliminary showing that a false statement [or omission] knowingly and intentionally, or with reckless disregard for the truth, was included in a warrant affidavit," and the "allegedly false statement is necessary to the finding of probable cause." Franks, 438 U.S. at 156; United States v. Carneiro, 861 F.2d 1171, 1176 (9th Cir. 1988). A showing of mere negligence or inadvertence is insufficient. State v. Chenoweth, 160 Wn.2d 454, 462, 158 P.3d 595 (2007); Franks, 438 U.S. at 171.

Saloy claims that the State's application made several false statements including: "(1) that Saloy told Sanchez he admitted using a .38 caliber firearm during the shooting, (2) that Saloy told Sanchez the specific caliber of weapon Fola had used, and (3) that Saloy told Sanchez he and Fola had been driving a Taurus during the shooting, when Saloy had just said they used Fola's sister's car."

In this case, it appears that Duffy's affidavit did misstate what Saloy told Sanchez. However, Saloy also confessed these same facts to other witnesses included in the affidavit. First, Saloy told Downs that he had a .38 caliber revolver and Fola had

---

[2] The State argues that the Privacy Act is not subject to Franks in accordance with this court's decision in State v. D.J.W., 76 Wn. App. 135, 145, 882 P.2d 1199 (1994). This court held in D.J.W, that the standard for probable cause was not the constitutional standard of the Fourth Amendment, but simply required the same deferential review that the facts set forth in the application be "minimally adequate to support the authorizing court's determinations." D.J.W., 76 Wn. App. at 146. However, on appeal, the Supreme Court decided "[b]ecause we hold the conversations here were not private . . . we do not consider the defendants' arguments that probable cause in the Privacy Act equates to probable cause under the Fourth Amendment, or that RCW 9.73.090(5) contemplates an individualized probable cause finding. Clark, 129 Wn.2d at 223 n.12. As the Supreme Court has yet to determine whether the Fourth Amendment applies, and because the lower court relied on the Franks analysis, we will review the ruling under Franks.

a .40 caliber semiautomatic firearm at the time of the shooting. Second, Graves told investigators that the car involved appeared to be a silver Ford Taurus. Third, Fola told investigators that his brother owned a gray Ford Taurus that he sometimes drove. Duffy then independently verified that Fola's sister-in-law was the registered owner of a gray Ford Taurus.

Saloy also claims that the application omitted: "(1) Sanchez's criminal history and (2) the fact that Taray[3] David had identified Monroe Ezell as the shooter." But the two alleged omissions were minor and did not affect the finding of probable cause. First, the affidavit did state that Sanchez was associated with the same gang as Saloy, and stated the pressure he was under to cooperate. Second, the affidavit listed several other witnesses who had identified Monroe Ezell as being one of the shooters, and the affidavit acknowledged that Ezell was still a suspect.

None of the alleged false statements or omissions were material to a finding of probable cause; the trial court did not err in denying the Franks hearing and admitting the recording.

II

Saloy next asserts that the prosecutor committed misconduct when she impugned the integrity of defense counsel and made an unconstitutional comment about the defendant's decision not to testify thus violating his rights under the Fifth Amendment. We disagree.

We review the trial court's denial of a mistrial for abuse of discretion and we find abuse only "'when no reasonable judge would have reached the same conclusion.'"

---

[3] For clarification, Taray David is referred to as Tyree David on the record.

State v. Hopson, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989) (quoting Sofie v. Fibreboard Corp., 112 Wn.2d 636, 667, 771 P.2d 711 (1989)). To prevail on a claim for prosecutorial misconduct, the defendant bears the burden of establishing that the prosecuting attorney's conduct was improper, prejudicial, and "had a substantial likelihood of affecting the jury's verdict." State v. Emery, 174 Wn.2d 741, 756, 760-61, 278 P.3d 653 (2012); State v. Warren, 165 Wn.2d 17, 26, 195 P.3d 940 (2008). We review a prosecuting attorney's allegedly improper remarks in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury. State v. Anderson, 153 Wn. App. 417, 427, 220 P.3d 1273 (2009). A trial court should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial could ensure that the defendant receives a fair trial. Emery, 174 Wn.2d at 765. State v. Hopson, 113 Wn.2d at 284.

## A

Saloy first moved for a mistrial after the State rested, claiming that the prosecutor impugned defense counsel by questioning two uncooperative CD gang members. The prosecutor asked Graves and Jimerson whether they recalled a visit by defense counsel and her investigator. The prosecutor, however, did not ask Thomas, a cooperative CD gang member, whether defense counsel visited him. Saloy contends that the prosecutor's questions suggested Saloy's counsel had acted unethically by visiting only the uncooperative witnesses. The trial court denied Saloy's motion, finding no error and finding that an instruction would be confusing.

1

The State contends that Saloy did not timely object to the prosecutor's questioning of either witness. For an objection to be timely, "the party must make the objection at the earliest possible opportunity after the basis for the objection becomes apparent." See State v. Gray, 134 Wn. App. 547, 557, 138 P.3d 1123 (2006) (citing State v. Jones, 70 Wn.2d 591, 597, 424 P.2d 665 (1967)). Testimony admitted without objection is not reviewable on appeal. Jones, 70 Wn.2d at 597. In general, when the objection is regarding testimony, it "must be made when testimony is offered and an objection to a question after it has been answered comes too late." Jones, 70 Wn.2d at 597; Singh v. Edwards Lifesciences Corp., 151 Wn. App. 137, 153, 210 P.3d 337 (2009).

Saloy maintains that the delay was legitimate because the implication was not apparent until the prosecutor had asked both uncooperative witnesses about their meetings with the defense counsel and then not asked the cooperative witness. It is questionable whether waiting until the State had rested their case to object was "at the earliest possible opportunity after the basis for the objection becomes apparent." See Gray, 134 Wn. App. at 557. However, because it is conceivable that the implication would take time to become apparent and because the trial court considered and made a ruling on the objection, this court will consider its merits.

2

A prosecutor is prohibited from impugning the role or integrity of defense counsel. State v. Lindsay, 180 Wn.2d 423, 432, 326 P.3d 125 (2014). "Prosecutorial statements that malign defense counsel can severely damage an accused's opportunity

-15-

to present his or her case and are therefore impermissible." Lindsay, 180 Wn.2d at 431-32 (citing Bruno v. Rushen, 721 F.2d 1193, 1195 (9th Cir. 1983)).

Here, however, in considering the entire context of the direct examination, the questions posed to the witnesses about meeting with defense counsel were unlikely to create the implication that Saloy suggests. The question to Jimerson was intended to refresh his memory about a recorded call he made after learning about the case from defense counsel. The question to Graves was an attempt to get him to testify to statements he had made to defense counsel during their initial interview, which he was refusing to acknowledge during trial. Moreover, defense counsel was able to cross-examine both witnesses and could use that time to clarify the extent of their interviews.

Saloy failed to show "that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." Emery, 174 Wn.2d at 760-61. The trial court did not abuse its discretion in denying the first motion for mistrial.

B

After the State completed its closing argument, Saloy moved for a mistrial due to prosecutorial misconduct contending that the prosecutor commented on Saloy's failure to testify at trial by stating:

> So it's possible that there was a third gun there. We can't say that one way or the other. And since no one except for the defendant can conclusively say or has conclusively said how many people were in the car it isn't a possibility that can necessarily be ruled out. But again that's not something that you have to decide beyond a reasonable doubt.[4]

The trial court denied the second motion for mistrial finding that the prosecutor's comment was insignificant when considered in context and had been corrected by the

---

[4] RP (Aug. 6, 2014) at 64 (emphasis added).

prosecutor. The court also declined to issue a clarifying instruction because the objection did not occur at the time of the statement and would thus be confusing.

1

The State also contends Saloy did not raise a timely objection to the prosecutor's closing argument by waiting until after the closing had ended. But a motion for a mistrial due to prosecutorial misconduct directly following the prosecutor's rebuttal closing argument is sufficient to preserve the objection for appellate review. State v. Lindsay, 180 Wn.2d 423, 430-31, 326 P.3d 125 (2014) See United States v. Prantil, 764 F.2d 548, 555 n.4 (9th Cir.1985) (mistrial motion following the prosecutor's closing is "an acceptable mechanism by which to preserve challenges to prosecutorial conduct"). Therefore, this motion was timely and we will consider the merits of this objection.

2

Saloy asserts the prosecutor commented on his failure to testify in violation of his right to remain silent and to due process. The Fifth Amendment bars the prosecution from commenting on a defendant's failure to testify at trial. Griffin v. California, 380 U.S. 609, 609-15, 85 S. Ct. 1229, 14 L. Ed. 2d 106 (1965). A prosecutor violates a defendant's Fifth Amendment rights if the prosecutor makes a statement "of such character that the jury would 'naturally and necessarily accept it as a comment on the defendant's failure to testify.'" State v. Ramirez, 49 Wn. App. 332, 336, 742 P.2d 726 (1987) (quoting State v. Crawford, 21 Wn. App. 146, 152, 584 P.2d 442 (1978)).

At trial, a "prosecutor may say that certain testimony is undenied as long as he or she does not refer to the person who could have denied it." State v. Fiallo-Lopez, 78 Wn. App. 717, 729, 899 P.2d 1294 (1995) (citing Ramirez, 49 Wn. App. at 336)). In

-17-

Fiallo-Lopez, the court found the prosecutor had improperly commented on the defendant's silence when the prosecutor argued, "there was no attempt by the defendant to rebut the prosecution's evidence regarding his involvement in the drug deal." 78 Wn. App. at 729. Here, the prosecutor specifically stated, "no one except for the defendant can conclusively say or has conclusively said how many people were in the car." Although the prosecutor attempted to clarify the statement by adding "or has conclusively said," the prosecutor specifically stated that the defendant was the only one who could provide that evidence. Therefore, the argument improperly commented on the defendant's constitutional right not to testify and was misconduct.

While the statement constituted constitutional error, "[i]t is well established that constitutional errors may be so insignificant as to be harmless." State v. Ng, 110 Wn.2d 32, 37, 750 P.2d 632 (1988). A constitutional error is harmless "if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error." State v. Guloy, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985). In Washington, we determine whether the error was harmless by applying the "overwhelming untainted evidence" test, meaning, "we look at the untainted evidence to determine if it is so overwhelming that it necessarily leads to a finding of guilt." State v. Ramirez, 49 Wn. App. 332, 339, 742 P.2d 726 (1987) (citing Guloy, 104 Wn.2d at 426).

The improper comment occurred after an hour of closing argument. The prosecutor was in the middle of making an argument about the number of guns and shooters at the scene. The comment was made in order to make the point that regardless of how many people were in the car, Saloy was still guilty of murder and

-18-

attempted murder. The prosecutor did not argue that Saloy was guilty because he did not deny the allegations at trial. Nor did the prosecutor argue that Saloy's lack of testimony indicated guilt. Thus, despite the improper comment, the comment was merely transitory and had no effect on the evidence presented against Saloy.

The primary evidence used to convict Saloy was the recording of Saloy's confession that he had actively participated in the shooting. This confession was not affected by the possibility that there may have been a third person in the car. Even if another person in the car had been the one to fire the shots that had killed and wounded the victims, Saloy would still be liable as an accomplice.[5] See Sarausad v. State, 109 Wn. App. 824, 39 P.3d 308 (2001) (Accomplice liability for a murder, an assault, or both, can be based on a determination that an ordinary person would know that a drive-by shooting is likely to result in death or injury of one or more people). The improper comment on Saloy's Fifth Amendment right would only taint evidence of whether there had been another person in the car, it does not invalidate Saloy's confession that he and Fola had been in the car. The untainted evidence of guilt is sufficient to convince this court beyond a reasonable doubt that the improper argument did not affect the jury verdict and hold that the error was harmless.

III

Saloy argues next that the trial court abused its discretion in admitting evidence including photographs, images, video clips related to gang activity, and evidence that

---

[5] RCW 9A.08.020: (3) A person is an accomplice of another person in the commission of a crime if:(a) With knowledge that it will promote or facilitate the commission of the crime, he or she:(i) Solicits, commands, encourages, or requests such other person to commit it; or (ii) Aids or agrees to aid such other person in planning or committing it; or (b) His or her conduct is expressly declared by law to establish his or her complicity.

Saloy had urinated at or near the location where Coleman was shot and killed. We disagree.

We review the trial court's decision to admit evidence for abuse of discretion and will not overturn the trial court's decision unless it is manifestly unreasonable or based upon untenable grounds. State v. Athan, 160 Wn.2d 354, 382, 158 P.3d 27 (2007); State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995). A trial court abuses its discretion only when no reasonable person would have decided the issue as the trial court did. State v. Russell, 125 Wn.2d 24, 78, 882 P.2d 747 (1994).

Evidence must be relevant to be admissible at trial. ER 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Besides being relevant, a trial court must also determine on the record whether the danger of undue prejudice substantially outweighs the probative value of the evidence, "in view of the other means of proof and other factors." ER 403; Powell, 126 Wn.2d at 264. "When evidence is likely to stimulate an emotional response rather than a rational decision, a danger of unfair prejudice exists." State v. Beadle, 173 Wn.2d 97, 120-21, 265 P.3d 863 (2011) (citing Powell, 126 Wn.2d at 264)). "Nonconstitutional error requires reversal only if, within reasonable probabilities, it materially affected the outcome of the trial." Beadle, 173 Wn.2d at 120-21.

A

Saloy contends that the trial court abused its discretion when it allowed: (1) 59 photographs, including a collection from Saloy's Myspace website showing Saloy with

his friends posing next to graffiti and displaying gang signs; (2) photographs of the tattoos on Saloy's body, and (3) images of writings and drawings made by Saloy. Saloy also contends the trial court abused its discretion in allowing an approximately 25-second video that Detective Hughey collected from Saloy's Myspace page. In the video, Saloy discusses his loyalty to the South End, expresses his hatred of the CD, refers to his murdered friend, calls out and mocks Clark and other CD gang members, and threatens to shoot them. The trial court allowed the video to be shown to the jury.

Saloy relies on State v. DeLeon, where our Supreme Court recently urged "courts to use caution when considering generalized gang evidence" because "[s]uch evidence is often highly prejudicial, and must be tightly constrained to comply with the rules of evidence." State v. DeLeon, 185 Wn.2d 478, 491, 374 P.3d 95 (2016). This case, however, is distinguishable from DeLeon. The evidence in DeLeon consisted of generalized statements about gangs and their activities indicating, "the defendants were part of a pervasive gang problem and were criminal-types with a propensity to commit the crimes charged." DeLeon, 185 Wn.2d at 491. In this case, the prosecutor moved to admit the gang evidence in order to demonstrate that Saloy was in a gang, and to demonstrate his behavior relating to the gang.

The trial court did not abuse its discretion in allowing the challenged evidence. While the evidence had a significant chance of being prejudicial, it was relevant and probative to the gang aggravator attached to the crime, and Saloy declined to stipulate to the aggravator at trial. The evidence was also relevant to Saloy's motive and intent to commit the crime. Since a reasonable person could conclude under these circumstances that the prejudicial nature of this evidence did not outweigh its probative

-21-

value, we find no abuse of discretion under ER 401 and ER 403. The court also provided a limiting instruction to the jury on the proper use and consideration of the evidence before admitting it. If the trial court gives a limiting instruction, we presume jurors have followed that instruction, absent evidence proving the contrary. State v. Montgomery, 163 Wn.2d 577, 596, 183 P.3d 267 (2008). As the jury did not find Saloy guilty of the gang aggravator, there is no indication that the evidence materially affected the outcome of the trial.

B

Saloy also asserts that the trial court erred in admitting evidence that Saloy urinated near where Coleman had died, arguing that the danger of unfair prejudice outweighed the probative value. The wire recording, which was played for the jury, includes the conversation between Sanchez and Saloy as they arrived at the scene of the shooting. They got out and smoked, at which time Saloy urinated near or on the stairs where Coleman died.[6] The video does not visually depict this event occurring. Saloy then pointed out where Coleman had fallen, where the other people had been standing, and talked about how Clark had screamed and ran.

The court determined that the evidence was clearly probative and engaged in an ER 403 analysis.[7] While the court recognized it was prejudicial because the incident occurred while Saloy was describing the events of the crime, and indicated his state of

---

[6] Saloy calls this Coleman's memorial. Although there was reference to a "memorial" in the argument of the parties, the tape only indicated that Saloy urinated near the area where Coleman had died; there was no testimony in the recording regarding a "memorial." RP (July 28, 2014) at 62, 81.

[7] "It's clearly probative, it's clearly somewhat prejudicial because—I mean it's compelling, right? All evidence is somewhat prejudicial. The question is, is it unduly prejudicial." RP (Apr. 7, 2014) at 154.

mind about the crime, the court found the evidence had substantial probative value. We agree.

The statement that Saloy was urinating on the ground where Coleman was shot was linked with evidence that he knew a substantial amount about the facts of the crime, such as where the victims had been standing before they were shot. While the evidence was prejudicial, it was also highly relevant and probative. Since a reasonable person could conclude that the prejudicial nature of this evidence did not outweigh its probative value, the trial court did not abuse its discretion under ER 401 and ER 403.

IV

Saloy argues next that because he was 16 years old at the time of the shooting, but 20 years old when the State charged him, his right to due process was violated by the State's intentional or negligent prosecutorial delay. Saloy bases this claim on his assertion that Washington's "automatic decline" statue, RCW 13.40.030, is unconstitutional and therefore, if he had been charged while still a minor, the juvenile court might have determined it was appropriate to retain jurisdiction. We disagree.

This court reviews a due process claim based on preaccusatorial delay de novo. State v. Maynard, 183 Wn.2d 253, 259, 351 P.3d 159 (2015). This means we examine the entire record to determine prejudice and to balance the delay against the prejudice. State v. Oppelt, 172 Wn.2d 285, 290, 257 P.3d 653 (2011).

A

A court will dismiss a prosecution for preaccusatorial delay if the State's intentional or negligent delay violates a defendant's due process rights. Oppelt, 172 Wn.2d at 288-89. In determining this issue we apply a three-pronged test: (1) the

-23-

defendant must show he or she was actually prejudiced by the delay, (2) if the defendant shows actual prejudice, the court must determine the reasons for the delay, and (3) the court must weigh the reasons for delay and the prejudice to determine whether fundamental conceptions of justice would be violated by allowing the prosecution. Maynard, 183 Wn.2d at 259 (citing Oppelt, 172 Wn.2d at 295).

Although a defendant has no constitutional right to be tried as a juvenile, we recognize that juvenile court offers an offender important benefits. Maynard, 183 Wn.2d at 259; see State v. Dixon, 114 Wn.2d 857, 860, 792 P.2d 137 (1990). By statute, a juvenile defendant loses the benefits of the juvenile court if the court does not extend jurisdiction before the defendant turns 18. RCW 13.40.300(1)(a). A defendant may meet his or her burden to show actual prejudice when the preaccusatorial delay causes the loss of juvenile jurisdiction. Maynard, 183 Wn.2d at 259-260; State v. Salavea, 151 Wn.2d 133, 139, 86 P.3d 125 (2004).

In this case, Saloy was 16 years old at the time of the shooting, but was 20 years old when the State charged him. Thus, by the time Saloy was charged, he was no longer within the jurisdiction of the juvenile courts. Generally, this would be sufficient to demonstrate prejudice. However, Saloy was subject to RCW 13.04.030—the "automatic decline statute," which automatically transfers proceedings of 16 or 17 year olds who commit serious violent offenses to the exclusive jurisdiction of the adult criminal court. First degree murder is defined as a serious crime by RCW 9.94.030. Thus, even if the State had filed charges before Saloy turned 18, his case would have automatically transferred into the jurisdiction of the adult criminal court. The State, therefore, argues that Saloy cannot demonstrate prejudice caused by the delay.

-24-

In order to demonstrate prejudice, Saloy contends that the automatic decline statute, RCW 13.04.030, is unconstitutional. Saloy relies on the reasoning in Miller v. Alabama and the dissent in Division Two's recent decision in State v. Houston-Sconiers, to argue that the juvenile court must hold a hearing to consider the age and vulnerability of the juvenile before it can transfer the case to a jurisdiction with harsher penalties and less leniency. Miller, 132 S. Ct. at 2471; State v. Houston-Sconiers, 191 Wn. App. 436, 447, 365 P.3d 177, 182 (2015), review granted, 185 Wn.2d 1032, 377 P.3d 737 (2016).[8]

Our Supreme Court upheld the constitutionality of the automatic decline statute in In re Boot, 130 Wn.2d 553, 925 P.2d 964 (1996). The Boot Court found that "[b]efore any scrutiny of a punishment under Eighth Amendment standards can occur . . . there must be a punishment." 130 Wn.2d at 569. Thus, according to the Court, a successful Eighth Amendment challenge to the automatic decline statute requires a showing that automatic transfer to adult court jurisdiction "in and of itself, is punishment." Boot, 130 Wn.2d at 569. Boot was issued substantially before the U.S. Supreme Court began considering how the Eighth Amendment's ban on cruel and unusual punishment applies to the sentencing of juveniles.[9] In 2015, Division Two of this court reconsidered the issue in Houston-Sconiers and affirmed the Supreme Court's decision and analysis in Boot. Houston-Sconiers, 191 Wn. App. at 443.

The dissent in Houston-Sconiers maintained that the automatic transfer to adult court did violate the Eight Amendment. 191 Wn. App. at 452. The dissent argued, "the declining of juvenile court jurisdiction faces the defendant with a much harsher world of

---

[8] The Supreme Court heard oral argument on October 18, 2016.
[9] See Roper v. Simmons, 543 U.S. 551, 568, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005); Graham v. Florida, 560 U.S. 48, 76, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010); Miller v. Alabama, 132 S. Ct. at 2469.

potential punishment"—specifically when considering mandatory firearm enhancements, which cannot be reduced even with consideration of mitigating factors, such as age. Houston-Sconiers, 191 Wn. App. at 452 (Bjorgen, J. dissenting). Miller reasoned that a sentence of life in prison alters the remainder of the juvenile's life "'by a forfeiture that is irrevocable.'" Miller, 132 S. Ct. at 2466 (quoting Graham, 560 U.S. at 69, 130 S. Ct. 2011). The dissent, therefore, would interpret Miller to find that the Eighth Amendment does not allow even "the possibility of forfeitures of such magnitude to be raised automatically for crimes committed by children." Houston-Sconiers, 191 Wn. App. at 454.

The sentencing of juveniles is a currently developing area of law that is heading towards allowing discretion and consideration at all phases of the prosecution. Miller, however, does not support finding RCW 13.04.030 unconstitutional on its face. Indeed, Miller acknowledged that "many [s]tates use mandatory transfer systems" where a "juvenile of a certain age who has committed a specified offense will be tried in adult court, regardless of any individualized circumstances" and never indicated that such systems were also a violation of the Eighth Amendment. Miller, 132 S. Ct. at 2474. The Supreme Court found that the discretion available for a judge at the transfer stage often presents "a choice between extremes: light punishment as a child or standard sentencing as an adult" which cannot substitute for discretion at posttrial sentencing in adult court. Miller, 132 S. Ct. at 2474. While Miller requires discretion in sentencing of juveniles, the Court did not conclude that that all automatic decline statutes are unconstitutional.

-26-

We hold that RCW 13.04.030 does not violate the Eight Amendment and therefore Saloy failed to meet his burden of demonstrating he was prejudiced by any preaccusatorial delay.

V

Saloy argues next that the trial court violated his rights under the Eighth Amendment by imposing a standard range, "de facto life sentence," of 712 months— nearly 60 years—without conducting an individualized evaluation of Saloy's age and circumstances surrounding his youth. Saloy contends the de facto life sentence is contrary to Miller and this court's decision in State v. Ronquillo, 190 Wn. App. 765, 784, 361 P.3d 779 (2015). Consistent with our Supreme Court's recent decision in Ramos, we agree.

Miller is the latest of three United States Supreme Court cases to address the Eighth Amendment's prohibition against cruel and unusual punishment in the context of sentencing persons for crimes committed as juveniles. Each case relies on the fundamental proposition that juveniles "are constitutionally different from adults for purposes of sentencing."[10] Miller, 132 S. Ct. at 2464. In Miller, the Court concluded that mandatory sentencing schemes that require the imposition of life without parole on juvenile offenders are constitutionally impermissible because it "precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." Miller, 132 S. Ct. at 2468. Imposing a mandatory life sentences further "prevents taking into account the

---

[10] See also Roper v. Simmons, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (Eighth Amendment prohibits the imposition of the death penalty for juveniles); Graham v. Florida, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010) (Eighth Amendment forbade the imposition of a life sentence on a juvenile offender who did not commit a homicide).

-27-

family and home environment that surrounds him—and from which he cannot usually extricate himself." Miller, 132 S. Ct. at 2468. While the Miller decision does not categorically bar a penalty of life without parole for a juvenile defendant, it does mandate that the sentence take "into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." Miller, 132 S. Ct. at 2469; In re McNeil, 181 Wn.2d 582, 588, 334 P.3d 548 (2014).[11]

In Ramos, our Supreme Court confirmed that juvenile offenders are entitled to a "Miller hearing," and consideration of an exceptional sentence downward, when facing literal or de facto life-without-parole sentences. The court summarized its holding:

> We hold that while not every juvenile homicide offender is automatically entitled to an exceptional sentence below the standard range, every juvenile offender facing a literal or de facto life-without-parole sentence is automatically entitled to a Miller hearing. At the Miller hearing, the court must meaningfully consider how juveniles are different from adults, how those differences apply to the facts of the case, and whether those facts present the uncommon situation where a life-without-parole sentence for a juvenile offender is constitutionally permissible. If the juvenile proves by a preponderance of the evidence that his or her crimes reflect transient immaturity, substantial and compelling reasons would necessarily justify an exceptional sentence below the standard range because a standard sentence would be unconstitutional.

State v. Ramos, slip op. at 9.

---

[11] Since Miller, the Washington State Legislature responded by enacting RCW 10.95.030 and RCW 9.94A.730, or the "Miller fix." McNeil, 181 Wn.2d at 588. RCW 10.95.030 gives the judge discretion to impose life without parole for youths who commit aggravated first degree murder at age 16 or 17 so long as the court takes into account the mitigating factors as provided in Miller. RCW 10.95.030 is not applicable because Saloy was convicted of first degree murder, not aggravated first degree murder. First degree murder still requires a sentencing range that is the functional equivalent of life in prison without parole. RCW 9.94A.730(1) allows "any person convicted of one or more crimes committed prior to the person's 18th birthday may petition the indeterminate sentence review board for early release after serving no less than twenty years of total confinement, provided the person has not been convicted for any crime committed subsequent to the person's eighteenth birthday." As the State concedes, Saloy was convicted of additional crimes after his 18th birthday therefore; he is not eligible for the 20-year release.

As the court further explained, "it is difficult to imagine any reason for an exceptional sentence downward that could be more substantial and compelling than the fact that a standard range sentence would be unconstitutional." Ramos, slip op. at 19. The court then concluded,

> Given these principles, it is clear that in order to give effect to Miller's substantive holding, every case where a juvenile offender faces a standard range sentence of life without parole (or its functional equivalent) necessarily requires a Miller hearing. The juvenile cannot forfeit his or her right to a Miller hearing merely by failing to affirmatively request it, and all doubts should always be resolved in favor of holding a Miller hearing.

Ramos, slip op. at 20.

The Supreme Court did not determine precisely how long a potential sentence must be in order to be considered a de facto life sentence and trigger the requirement for a Miller hearing. Ramos, slip op. at 15, n.5. In Ronquillo, we considered whether imposition of a 51.3 year sentence was a de facto life sentence for a 16 year old and concluded that it was. We explained "Ronquillo's sentence contemplates that he will remain in prison until the age of 68. This is a de facto life sentence. It assesses Ronquillo as virtually irredeemable. This is inconsistent with the teachings of Miller and its predecessors." Ronquillo, 190 Wn. App. at 775. Here, Saloy was sentenced to nearly 60 years for a crime he committed as a 16 year old. Under the sentence, Saloy will remain in prison until the age of 81. Like Ronquillo, Saloy's sentence is a de facto life sentence.

Consistent with Ramos, Saloy's sentence must be vacated, and he must be given a Miller hearing before resentencing. At Saloy's required Miller hearing, the trial court must do "far more" than an ordinary sentencing hearing. Ramos, slip op. at 20.

-29-

The court must do "far more than simply recite the differences between juveniles and adults and make conclusory statements that the offender has not shown an exceptional sentence downward is justified." Ramos, slip op. at 20.

> The court must receive and consider relevant mitigation evidence bearing on the circumstances of the offense and the culpability of the offender, including both expert and lay testimony as appropriate. The court and counsel have an affirmative duty to ensure that proper consideration is given to [Saloy's] "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." It is also necessary to consider [Saloy's] "family and home environment" and "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him." And where appropriate, the court should account for "incompetencies associated with youth" that may have had an impact on the proceedings, such as [Saloy's] "inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys."

> When making its decision, the court must be mindful that a life-without-parole sentence is constitutionally prohibited for juvenile homicide offenders whose crimes reflect "unfortunate yet transient immaturity" rather than "irreparable corruption." Moreover, due to "children's diminished culpability and heightened capacity for change . . . appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." The sentencing court must thoroughly explain its reasoning, specifically considering the differences between juveniles and adults identified by the Miller Court and how those differences apply to the case presented.

Ramos, slip op. at 20-22 (quoting Miller, 132 S. Ct. at 2468-69). If at the Miller hearing, Saloy proves by a preponderance of the evidence that his crimes reflect transient immaturity, he "has necessarily proved that substantial and compelling reasons necessarily justify an exceptional sentence below the standard range." Ramos, slip op. at 19.

VI

Saloy finally challenges the trial court's imposition of mandatory legal financial obligations (LFO) arguing that the imposition conflicts with State v. Blazina, 182 Wn.2d 827, 344 P.3d 680 (2015), and that the imposition of mandatory LFOs violates his right to due process. We disagree.

When any defendant is convicted of a felony, several fees, costs, and penalties are imposed. The court is required to impose a mandatory $100 DNA fee and a mandatory $500 Victim Penalty Assessment (VPA). RCW 43.43.7541; RCW 7.68.035. The trial court complied and imposed the two mandatory LFOs. The trial court waived "all other fines, fees and costs, based on the Defendant's indigency."

Saloy maintains that the trial court erred in assessing any LFOs without a determination of whether Saloy had the future ability to pay. Saloy relies on Blazina, which requires an individualized inquiry for discretionary LFOs. The trial court here did not impose discretionary LFOs. Blazina did not address the imposition of mandatory LFOs. We have previously held that Blazina does not apply to mandatory LFOs, and that a challenge to whether a LFO violates due process is not ripe for review until the State attempts to collect the obligation. State v. Shelton, 194 Wn. App. 660, 674, 378 P.3d 230 (2016). The trial court did not err in assessing mandatory LFOs.

## CONCLUSION

We vacate Saloy's sentence and remand for a new sentencing hearing during which the trial court must consider the factors laid out in <u>Miller</u> and exercise its discretion to considering a sentence below the standard adult range.

Mann, J.

WE CONCUR:

Schindler, J.                          Cox, J.